# CHAUNCEY BROADDUS v. STATE.

No. A-9553. May 5, 1939.
(90 P. 2d 457.)

Hughes & Hughes, of Hobart, for plaintiff in **error**.
Mac Q. Williamson, Atty. Gen., for the State.

DAVENPORT, J. By information the defendant was charged in the district court of Kiowa county, Okla., with assault upon Miss Rhoda Lee Walker, and did attempt to have sexual intercourse with and carnal knowledge of the said Rhoda Lee Walker by means of force and violence, was convicted and sentenced to serve one year in the county jail. The record was properly reserved, and the defendant appeals.

Rhoda Lee Walker, testifying on behalf of the state, in substance, stated:

"I live at 109 North Randlett street (Hobart, Okla.). I am the daughter of Mr. and Mrs. R. M. Walker; have lived in Hobart about eight years. Prior to that time I went to Teachers' College at Weatherford. I went to work at the Dixie March 1, 1930. I know the defendant, Chauncey Broaddus. I have known him practically ever since I have been here. His wife used to work at the store, and I knew him through that; and he came in the store quite a lot. His wife's people live just across the alley from us. On January 20, 1938, I quit work at the store about 6 o'clock in the evening, and went over to Dodds, the chiropractors. I had an appointment with Mrs. Dodd at 6 o'clock. After I got through there, I went down the street with them to Boothe's, and I turned north and went to Bradfield's, and turned the corner right there. That is the way I usually go home and come to work mornings. As I turned the corner, I saw the defendant, Chauncey Broaddus. He was in his car. He opened the door and asked me if I would like to ride up his way; he was going home, and, of course, I got in his car and started with him, as he was going out towards my home. I would often ride back and forth with other gentlemen who were going up towards my home. When I got in the car, I asked him if he had just got off from work and he said, 'Yes, Mrs. Bradfield will make you work all night if you'll let her.' He said he had to go through town, and we went through Main street, and came back around by Boothe's corner and stopped—and then he turned north and up Main street, and then on North Boundary. I live the second door off North Boundary. He asked me if I had had supper when we got up near Wimpy's, and I told him, 'No.' He

asked me if I would like to have a sandwich; and I said, 'No,' if he wanted to eat I would get out and go on. He said, 'No,' he would take me home first. And when we got to the corner, instead of turning west, he turned east, and I told him I wanted to go home, and he said, 'We will go for a little ride,' and I told him I did not care to go riding with him; I only wanted to go home. He did not pay any attention to me, and I opened the door, and started to get out. He pulled me back in and speeded the car up. He liked to have run into a big bus or truck or something, and he yanked the car back right quickly. He drove on to Lincoln street and turned south. I kept talking to him, and told him he had a wife and child, and that I could not afford to go out with a married man, and I had my family to think about. He paid no attention to me. He drove on a little ways, and I told him I would get out at the corner and walk on home, and he would not let me. He tried to put his hand on my knee, and I knocked it off, and told him he had the wrong person, I wasn't going out with him; and he refused to stop the car. He went so fast I could not jump out. He went straight south in the last block on Lincoln street. When we got almost there, he said, 'We will stop right down here, and we will talk this over.' And I said, 'That suits me fine,' and I told him I would get out then, and when he stopped the car, he reached over and grabbed me from the back, and started choking me. I had my hand on the door knob of the car, and I opened it, and started to get out. He grabbed me by the neck and choked me from the back. I pulled him almost out of the car. As I went by the knob of the door I tore the front out of my dress trying to pull him out, and finally got his hands loose. He choked me until my eyes stuck out. I tried to reason with him, and he would not pay any attention to me, and I was screaming for help. He pushed me, and I pushed him out, and we were all over the car in the front seat. He got me down in the front seat. When he hit me on the jaw he knocked me clear back in there, and pushed me back. I was laying down, and he had his hand holding it down with one knee and was holding my hair, holding my head back. He was over on top of me. He did not have my clothing pulled up. He was trying to, and I was fighting, and he could not. He did not pull my clothing back enough to expose my person. He choked me again

after he threw me down in the seat, and then he hit me. A man passed the car, and I yelled to the man, and he hit me again. Earlier when I first started to get out of the car, I saw a truck pass. I was yelling all the time for help. When I saw the man pass, I hollered, 'Mister, will you help me, please?'. I did not see him. I guess I was down in the car when he went back. He hit me at least three times or more. He hit me in the nose and my mouth. My nose was bleeding, and it ran down in my mouth and strangled me. I was spitting the blood out. I told him Dad would take him to the law for what he was doing, and he said he would kill me first, and he gave me another blow in the eye, and my eye swelled up until I couldn't see out of only one eye. Mr. Calhoun and Mr. Herrol came back, and I could see them coming through the back glass. By that time I had pushed him back up again. I was yelling, and they came down there, and then Mr. Herrol spoke to him, and pulled him back. I asked Mr. Herrol to take me, and Chauncey spoke up, and said, 'He is as bad as I am, you had as well let me take you on home.' I said I would not, I would walk, and I turned around and asked Mr. Calhoun if he would, and said, 'Mister, will you take me up the street?'. I did not know either of the men. Mr. Calhoun said, 'Lady, I sure will,' and he walked up to Evans with me. I washed and cleaned up there at the Evans place. I could see out of only one eye. The blood was running out of my mouth and nose, and, of course, it was all over my face. The next day that eye was blackened and one of my ears was swollen quite a bit. That was swelled, and this was black. The doctor took an X-ray. He thought sure my jaw was broken. At the time Mr. Calhoun and Mr. Herrol came up to the car, the defendant had got off and away from me. His clothes were undone and hanging down, that is, his trousers. He pulled them up when these men came up."

On cross-examination the testimony of the prosecuting witness was in substance the same as her direct examination.

Dr. J. P. Braun, testifying for the state, stated he was a physician and surgeon. His qualifications were admitted by both sides.

Dr. Braun stated:

"I am acquainted with Rhoda Lee Walker. I had occasion to see her on the night of January 20, 1938, on Thursday evening. I first saw her at the home of her friend Madie Evans. That is down in the south part of town on Lincoln street. She was very nervous, and her face was pretty badly bruised, especially the left eye had begun to swell shut, and pretty black and blue, and she complained of a little soreness in her neck. The side of her head and jaw was swollen and pretty sore. I examined her also the next day. Her condition looked worse. Her jaw had swollen considerably, and her left eye was swollen shut, and was black and blue. The right eye was blackened. She complained of not being able to open her mouth over a quarter of an inch. I had an X-ray made of her jaw, and found that her jaw was not broken. Her neck was reddened. She complained most of soreness. There was no bleeding when I saw her, excepting a little scratched place on her face. She had already cleaned up before I saw her. She complained of her neck being sore, and it was sore to the touch. As I recall there was a little scratched place over her left cheek."

Mr. Calhoun testified for the state that he lived in Hobart:

"Mr. Herrol lives on the 900 block, and I live on the 800 block, and Mr. Hulsey is just across the street from me, directly opposite from Mr. Herrol, and Mr. Herrol is just across the street directly opposite me. Those two houses are the only houses on the block, excepting on the west side there is a house which is over across the block on Jefferson street. The first thing of this alleged offense, I heard a scream. It sounded like a man or a woman. I did not pay much attention to it. I did not know but what it was some child down at the lower house on down at the highway. I had gone to the door when I first heard it and stepped back in the house and stayed a few seconds and stepped back out and heard it again. I went down there. I did not hear the scream any more after I started. The defendant's car was standing there on the west side of the road, and I started to pass. I went on the east side of the car. When I got right in front of the car, a lady hollered and said, 'Mister, will you help me,' and I turned and went back to Mr. Herrol's and got him. I did not know what was going on at the time. I got Mr. Herrol, and we walked

up to the car. Mr. Chauncey had his hand upon her shoulder. She asked us to make him turn her loose. And when Mr. Herrol told him to turn her loose, he did so. It seemed like his pants were a little unbuttoned in front. I never paid much attention to his shirt. We stood there a short while, and the girl said if she could find her purse she would go home. She got the purse, and asked one of us to walk back a piece of the way with her, and I told her I would. Mr. Broaddus told her if she wanted to go home, to get in the car and he would take her home, and she said, 'no.' I walked up to Evans with her, and Herrol stayed with Broaddus."

Mr. Calhoun's testimony on cross-examination was in substance a restatement of what he testified to on his direct examination.

Mr. Newlin Herrol, called on behalf of the state, testified in substance to the same facts as Mr. Calhoun, as to what took place after they got up to the car, and until the young lady was escorted by Mr. Calhoun up to the Evans' home.

Eddie Greer, testifying for the state, stated:

"I live on South Monroe street in Hobart, Okla. Monroe street is one block west of Lincoln. On January 20, 1938, I lived one block north and one block west of where the defendant's car was parked. I was outside, almost to the alley of my place, and I heard a woman scream real loud. When I heard her holler, 'Help,' I ran down there just as soon as I could. I did not go clear down to the car. I got to about 65 or 70 feet northwest of the car and just kinda' hunkered down trying to see what it was. I could see the bulks of two people scuffling on the west side of the car with the door open. I could hear her scream, 'Help,' several times. I could hear her screaming, and I could not hear the man saying anything. Except I heard the man say, 'Get down in this car,' or, 'Get in this car.' I could not tell which. It sounded like a man was sitting in the back seat of the car. It sounded like two fellows there, and I did not go on up. I went to the first house west to get some help, and the boys were all gone. There was an old man there, and he did not

care much about going down there. The next thing I did was to call the chief of police, Doss Kutch. I could still hear screaming up until I got to the house where I put in the call for the chief of police. All I heard her say was 'Help,' several times. The last thing I heard her say was, 'Oh, My God,' and she was being strangled. I could tell from her voice that she was being choked."

On cross-examination the witness reiterated in substance all his testimony on direct examination.

The foregoing is in substance the testimony of the state.

The defendant, Chauncey Broaddus, testifying in his own behalf, stated:

"I live in Hobart, Okla. I will be 32 July 22nd. I have known Miss Walker, the prosecuting witness, for some time; for to know who she was, possibly, three or four years. I am a married man; I have a wife and one boy. On the night of January 20, 1938, I saw her going north of Bradfield's. I was parked at the curb there by Bradfield's. She got in my car at that time. I asked her if she wanted to ride home. She was by herself. This was about 7:20 or 7:25 in the evening, a little after dark. I heard her state as to the way I drove. That is correct. I had had a few drinks that evening. I would say I was fairly well liquored up. When we came around as we approached Wimpy's, I asked her if she would have a sandwich, and she said she did not believe she would. I slowed up, and she said she wanted to go on home. We kept going north. I then proceeded right on north, on Main street. It wasn't very late, and after I turned, why, she says, 'I have to go home,' and I said, 'Well, let's just ride around a little while, make a circle of the block or two, and we will go on up to the house, and I will take you home.' And then I proceeded on east to Lincoln street and drove south. At the time I turned south, I did not have any particular route laid out, just driving around, that was all I had in mind, just driving around and circling around and going on back up home. I did not attempt to rape Miss Walker— I did not touch her—I did not touch her until we got down on South Lincoln. I guess it was in the 800 block of South Lincoln. She said she wanted to go home, and I said, 'We will drive down the street and make the circle

down here and go back up Main street.' She said, 'I have got to go home.' So I said all right. I was pretty well—like, I say—I had had a few drinks—a bad fault; and another bad fault of mine is when I am drinking, why, I am inclined to show a little affection towards a girl or lady at that time. I have done it before, out in a crowd, with my wife present. And she has warned me several times. It is my failing that when I get a little liquored up, and am out, even in a crowd, and some of the girls, or some of the men's wives, get around, and that I kinda' want to pat them or give them a little caress or something. I have done that in the presence of my wife, and she has warned me about it. I never had any intention whatsoever to harm this lady in any way. I just wanted to be a little affectionate to her, and I started to say, in the 800 block—in the 800 block, I put my arm around her and she objected. She not only objected, but she stuck me with a pin, and made me mad, and as I say, I had had a drink and was, I suppose, got angry a little more readily than I would if I had been sober. And I said, 'Right here is where we are going to settle this. You are going to get out of this car.' And when I said that, I opened the door on my side of the car and walked around and opened the car door. Miss Walker, I imagine, was pretty well excited. She knew that I was drinking at that time. And not knowing me well, she was bound to have been excited more or less. I opened the door and reached in to grab her, and when I did, she naturally fought back, and threw her hand up in my face. She scratched me on my forehead. When I reached in the car to grab her, she did not pick me at that time, because I had my hands holding on her arms. Then immediately when she got loose she began to stick me again and pretty hard. It just flew all over me, and before I thought I just stuck both my hands, and especially my right arm, right in her face, and harder than I really intended to because I was mad. I did not hit her with my fist; I just put my hand—just stiff armed her right in the face, and she had her arms up there scratching me, and fighting with this pin. And before I thought I hit her, and hit her too hard, I know. Quick as I realized it, I was sorry for it, and she was screaming all right, and I was trying to quiet her down and keep her from fighting me, and trying to keep her from screaming at the same time. When I went to get her out of the car,

I did not tell her where she could go, but I knew her stepbrother's house was close there. I reached in to get her, and pull her out of the car, and she would not get out, and she sat there and fought back at me. I did not know what she thought at all. I told her to get out of the car and reached in and tried to pull her out. At no time did I try to pull up her clothes, because it was nothing connected with that at all. We were scuffling and pulling and tugging, and when she was screaming, she had this pin at the beginning, and I was trying to keep her from sticking me with the pin with one hand, and with the other trying to get her to be still, because I knew we were close to people's houses, and did not want to cause any disturbance. In fact, I was trying to get my hand over her mouth to make her be still. The first remembrance I have of Mr. Calhoun being present is when she said, 'Will you help me?' and I looked up and saw Mr. Calhoun. I did not know who he was. I was still trying to get the lady to be quiet. I did not know Mr. Herrol by the name of Herrol, but by the name of Hammer, that is his nick-name. Nothing but my shirt of my clothing was disarranged. After Mr. Calhoun was there and left, and I realized that we had an audience, and I was trying to get Miss Walker to be still so that we could get things settled and go on home. When Mr. Calhoun and Mr. Herrol came back, we were outside of the car, and I had my hand on Miss Walker's shoulder and was telling her, 'Now, let's settle this thing the best way we can, and be still, and I will take you on home.' I was trying to avoid any disturbance. I had seen that we had attracted attention down there and wanted to quiet everything down. She said she would walk on home. Why my trousers were unbuttoned, when Mr. Calhoun and Mr. Herrol came back down and were not quite up with the car, when I noticed them, I noticed my shirt being out at that time, and when Mr. Calhoun left, and before they got back I straightened up. I was standing on the ground all the time by the car. She quieted down some after Mr. Calhoun passed, before he and Mr. Herrol returned to the car. All the side of my shirt was out, and it had evidently been pulled out in the scuffle. And to arrange the shirt I unbuckled my belt and stuffed my shirt back in my trousers. I never did ask her to have intercourse with me or anything of that sort."

On cross-examination, the defendant admitted that he told Mr. Kutch, the officer, that he did not know anything about what had taken place out there. But the defendant stated. that he knew all the time what he had done, notwithstanding that he had told the officer that he did not know what had taken place.

The defendant called Vernon McCraig, who testified as to his car being in the driveway, and the defendant coming home and driving his car in behind the McCraig car, and Mr. McCraig had to back the car out in order that he might get his car out.

The foregoing is all the testimony offered on behalf of the defendant.

The officers were called in rebuttal to show what statements defendant made to the officer the night of the trouble.

Defendant in his petition in error assigns ten errors, alleged to have been committed by the court in the trial of his case.

The first assignment goes to the action of the court in overruling the defendant's demurrer to the information in which the defendant alleges the information is duplicitous and attempted to charge more than one offense. Section 2886, O. S. 1931, O. S. A., title 22, section 404, in part is as follows:

"The indictment or information must charge but one offense, but where the same acts may constitute different offenses, or the proof may be uncertain as to which of two or more offenses the accused may be guilty of, the different offenses may be set forth in separate counts in the same indictment or information and the accused may be convicted of either offense, and the court or jury trying the cause may find all or either of the persons guilty of either of the offenses charged, and the same offense may be set forth in different forms or degrees under different counts. * * *"

The defendant urges that the information is bad for

duplicity and charged more than one offense in the same count of the information.

We admit the information in this case is not a model and could have been drawn to have more clearly expressed the charge against the defendant. This court has repeatedly held that:

"An information is sufficient which informs an accused of the offense with which he is charged with such particularity as to enable him to prepare for his trial, and so defines and identifies the offense that, if convicted or acquitted, he will be able to defend himself against any subsequent prosecution. * * *" McGhee v. State, 49 Okla. Cr. 387, 294 P. 649.

If a reasonable person can understand what is intended by the language of the indictment or information, that is sufficient. Price v. State, 9 Okla. Cr. 359, 131 P. 1102.

The information in this case advised the defendant of the charge he was supposed to meet, and stated facts sufficient to warrant the court in overruling the demurrer of the defendant.

The contention of the defendant that the court erred in overruling his demurrer is without merit.

The next assignment argued by the defendant is his eighth assignment, and that is the defendant contends that the court was in error in the admission of incompetent and prejudicial evidence which was brought out on cross-examination of the defendant over the objections and exceptions of the defendant.

The evidence complained of by the defendant is in substance that the state on cross-examination asked the defendant if he had not mauled several of the women around town prior to this time, to which the defendant answered, "No"; and the defendant was asked if he remembered an occasion when he had Miss Evans out, and she had to run off from him. The defendant stated that she did not run

off from him; she came home. "I had her in the car, and I took her home."

The defendant denied that he ever annoyed or troubled Mae Zinn or a lady who lived in an apartment whose name is not given.

It will be seen from the record that the testimony complained of by the defendant was brought out in the defendant's cross-examination, and that he was being cross-examined on a statement made by him in his direct examination, in which the defendant stated:

"And I was pretty well—like I say, I had had a few drinks—a bad fault; and another bad fault of mine is when I am drinking, why, I am inclined to show maybe a little affection towards a girl or lady at that time. I have done it before, out in a crowd, with my wife present. And she has warned me several times."

The defendant replied to the following question asked by his attorney:

"Q. Well, let me ask you this, Chauncey, it is your feeling that when you get a little liquored up, and are out, even in a crowd, and some of the girls or some of the men's wives get around, that you kinda' want to pat them or give them a little caress or something? A. I have done it. Yes, sir."

When the defendant takes the stand he occupies the same position as any other witness, and the state has the right to cross-examine him on any matters material to the issue, and on any evidence given or statement made by him while on the witness stand.

We have carefully read the record in this case, and the brief of the defendant on the question of the cross-examination of the defendant as to his previous conduct with other women. And we hold that the action of the court in permitting the cross-examination by the state of the defendant as to his former conduct with other ladies is not such an error as would warrant this court in reversing the case.

The defendant argues, with a great deal of force, that the admission of the testimony brought out in the defendant's cross-examination, complained of, was an error, and cites Brockman v. State, 60 Okla. Cr. 75, 61 P. 2d 273. An examination of that case, and the authorities cited therein, clearly shows that the facts are far different from the facts in the case at bar, and therefore is not applicable to the questions discussed in this case.

This case is unusual for the reason that we find a married man living in the same city with the prosecutrix, offering his services to drive her home when she is returning from her day's labor, and the prosecutrix accepted his kind offer, got in his car, and, as she thought, they had started home, but instead of going home, notwithstanding that the prosecutrix insisted she must go home, the defendant drove from place to place around the city, and finally started south on Lincoln street. The prosecuting witness wanted to get out and go home, and the defendant admits that on several occasions she begged him to take her home, and he declined to do so. He admits that he finally started down south on Lincoln street, and tried to put his arm around the prosecutrix's waist, and she resisted, and that he drove on down to what is near the end of Lincoln street, and where there are only two or three houses within a block or two of that street, and then stopped his car, and there it was where he said "We are going to discuss the matter and settle it." The prosecuting witness stated that the defendant grabbed her from the back and began to pull her down, and choked her, and she began to scream, and they scuffled, and finally she pricked the defendant with a pin of some kind, and the defendant kept holding her, and that defendant choked and finally struck her in the face two or more times, and the prosecutrix continued to holler until she attracted the attention of two men living in the block a short distance from where the car was parked, and one living across the block on another street.

According to the statement of Miss Walker, the prosecutrix, the defendant tried to pull up her clothes, but she fought him until he could not do so, and that he had his trousers undone.

The defendant admits stopping the car where Miss Walker says he did; he admits pulling her around, but says he tried to make her get out of the car; he admits that he struck her harder than he expected to strike her, and that when she pricked him with the pin, it made him mad, and he then struck her in the face. The prosecuting witness said the defendant threw her down in the seat of the car with his trousers undone and was on top of her, and finally in the fight she managed to get loose from him and got out by the side of the car. During the greater part of this time the prosecutrix was hollering for help, and the defendant persisted in the struggle and scuffle with her. The defendant, when Mr. Calhoun and Mr. Herrol, two witnesses, came to the car in response to the prosecutrix's screams and appeal for help, still had his arm on her shoulder and was detaining her there in scuffling, and both these men testified in the case that they made defendant turn the prosecutrix loose, and Mr. Calhoun walked with her up to the house of Madie Evans, a friend of the girl.

The defendant admits every statement made by the prosecutrix, except that he claims that he did not try to raise her clothes. He admits that his trousers were loose, and claims that when he discovered his shirt was out of his trousers he unbuckled his belt and put his shirt-tail in his britches, and pulled his trousers up.

The defendant also admits, using this expression, "I was liquored up that night," and that when he was drinking he had an affectionate desire to caress or pat ladies. He says he did not attempt to have sexual intercourse with the prosecutrix, but he does not explain why he drove down to the end of Lincoln street to have it out and settle

the trouble, and even admits that after they got out of the car he tried to get the prosecutrix to hush, and tried to settle the matter and go on home. He admits that he tried to put his hand over the prosecutrix's mouth to keep her from screaming and attracting attention to what was going on at the car.

There is an old adage, and there is a great truth in it, that actions speak louder than words. No one could read this record, including the defendant's own testimony, without reaching the conclusion that it was willful upon the part of the defendant to take this poor girl out by herself in a quiet, sparsely settled part of the city, and to have intercourse with her, even though he had to resort to force, and it is, indeed, fortunate for the poor girl while she was being assaulted and beaten up in the car by the defendant that Mr. Calhoun and others heard her screams, and went to her rescue; otherwise, it is the opinion of this court that had they not gone to her rescue, the defendant would not be here for assault with intent to commit rape, but would have been tried for rape.

We hold that the testimony in this case clearly shows that the defendant, when he got the prosecutrix in the car with him, immediately decided to drive her to some quiet and sparsely settled part of the city, and there assault and have sexual intercourse with her.

There is practically no conflict in the testimony. The court's instructions were as fair to the defendant as they were to the state, and correctly advised the jury as to the law applicable to the facts.

There is no error in the record prejudicial to the rights of the defendant. He had a fair trial, and the jury by its verdict said he was guilty and imposed a sentence of one year in the county jail for his crime, alleged and proven.

The judgment is affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.